IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BEN D. MAHAFFEY,<br><br>　　　　　　　　Plaintiff,<br>v.<br><br>CITY OF VERNAL, a municipal corporation;<br>City Manager KEN BASSETT, Police Officers<br>SHAWN SMITH and ROD ESKELSON;<br>Chief of Police DYLAN ROOKS; and<br>Assistant Chief of Police KEITH<br>CAMPBELL,<br><br>　　　　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:13-cv-4 DN<br><br>District Judge David Nuffer |

This case arises out of seizure of prescription drugs from the home of a recently deceased woman. Claims against Police Chief Dylan Rooks, claims against defendants in their official capacities, and a state law claim of intrusion upon seclusion have been dismissed.[1] This order resolves Defendants' motion for summary judgment[2] by granting summary judgment in favor of all defendants on Plaintiff's equal protection claim.[3] Summary judgment is also granted in favor of Defendant Bassett on all claims. Summary judgment is denied on Plaintiff's Fourth Amendment[4] and Due Process claims.[5] Summary judgment on the defense of qualified immunity is also denied.

---

[1] Docket no. 13, filed July 10, 2013.

[2] Defendants' Motion for Summary Judgment ("Motion"), docket no. 20, filed January 28, 2014.

[3] Amended Complaint (Count II) at 8-9, docket no. 4, filed February 7, 2013.

[4] Amended Complaint (Count I) at 6-7.

[5] Amended Complaint (Count III) at 10-11.

## FACT SUMMMARY AND CLAIMS

Plaintiff Ben Mahaffey called dispatch for the Vernal City Police Department shortly after his wife Barbara passed away. Officers Rod Eskelson and Shawn Smith responded. Officers Eskelson and Smith went to Mr. Mahaffey's home and took Ms. Mahaffey's prescribed medications. Mr. Mahaffey contends that the officers violated his constitutional rights and filed this civil rights action pursuant to 42 U.S.C. § 1983. Mr. Mahaffey alleges violations of the Fourth Amendment protection against unreasonable searches and seizures, the Fifth Amendment right to due process, and the Fourteenth Amendment right to equal protection. He alleges supervisory liability claims against Assistant Police Chief Keith Campbell and City Manager Ken Basset, and a municipal liability claim against Vernal City.

FACT SUMMMARY AND CLAIMS .......................................................................................... 2

UNDISPUTED FACTS .......................................................................................................... 3

DISCUSSION ...................................................................................................................... 10

    1. SUMMARY JUDGMENT STANDARD ................................................................. 10

    2. FOURTH AMENDMENT CLAIM .......................................................................... 10

    3. QUALIFED IMMUNITY ....................................................................................... 14

    4. EQUAL PROTECTION CLAIM ............................................................................ 16

    5. DUE PROCESS CLAIM ......................................................................................... 16

        Property Interest ....................................................................................................... 18

        Postdeprivation Remedies ........................................................................................ 20

    6. SUPERVISORY LIABILITY ................................................................................. 21

        Assistant Chief of Police Campbell ......................................................................... 22

        City Manager Bassett ............................................................................................... 23

    7. MUNICIPAL LIABILITY ...................................................................................... 24

ORDER ............................................................................................................................... 26

## UNDISPUTED FACTS

1.       Vernal City instructed hospice companies operating within City limits to notify the Vernal City Police Department when one of their patients dies outside a hospital or care facility.[6]

2.       One of the reasons is to confirm the circumstances surrounding the death were not suspicious, such as overmedication, negligent hospice care, a mercy killing or other type of homicide.[7]

3.       Officer Eskelson testified that when officers arrive at the location where the death of a hospice patient occurred, they look for "[s]uspicious injuries on the body, things of that nature" but that "Beth would have pointed them out, told [the officers] about suspicious behavior."[8]

4.       Another reason is to prevent prescription drug theft or abuse by those who know such prescriptions are in the residence, including neighbors, family members or even hospice workers.[9]

5.       Vernal City police officers only respond to hospice deaths outside a care facility when they are notified of a death.[10]

6.       Beth Carroll, the director of nursing at Good Shepherd Hospice,[11] met with Ben and Barbara Mahaffey prior to Ms. Mahaffey's passing to explain hospice protocols and procedures.[12]

---

[6] Deposition of Ken Bassett ("Deposition of Bassett") at 28:18–29:17, attached as exhibit 1 to Memorandum in Opposition to Defendants' Motion for Summary Judgment, docket no. 23-1, filed March 6, 2014.

[7] Deposition of Keith Campbell ("Deposition of Campbell") at 36-37, attached as exhibit 2 to Memorandum in Opposition to Defendants' Motion for Summary Judgment, docket no. 23-2, filed March 6, 2014.

[8] Deposition of Rod Eskelson ("Deposition of Eskelson") at 21, attached as exhibit 4 to Memorandum in Opposition to Defendants' Motion for Summary Judgment, docket no. 23-4, filed March 6, 2014.

[9] Deposition of Campbell at 27:15-23, 35-36.

[10] *Id.* at 31.

7.      Ms. Carroll explained that when Ms. Mahaffey passed away, hospice would call for an officer to come to the house, count and dispose of any excess prescription medications.[13]

8.      Mr. Mahaffey was aware before officers arrived that an officer would be sent to his house because dispatch informed him an officer would be responding when he called to report Ms. Mahaffey's death.[14]

9.      Just after midnight on May 21, 2012, Mr. Mahaffey called dispatch to notify police that Ms. Mahaffey had passed away. Dispatch stated officers would arrive to assist.[15]  Mr. Mahaffey understood they would be coming. He said, "That's why you call."[16]

10.     Ms. Carroll also called dispatch to notify police of Ms. Mahaffey's death.[17]

11.     Officers Rod Eskelson and Shawn Smith arrived. Mr. Mahaffey was at the door.[18] It appeared to Ms. Carroll that Mr. Mahaffey "invit[ed] them in."[19]

12.     Contrary testimony was provided by family friend, George Vest, who was present and witnessed all events unfold. Mr. Vest said:

> "And I remember – I just remember the look of disgust on Ben's face that the police were knocking on his door and I thought he was going to turn around and

---

[11] Deposition of Beth Carroll ("Deposition of Carroll") at 5-6, attached as exhibit 5 to Memorandum in Opposition to Defendants' Motion for Summary Judgment, docket no. 23-5, filed March 6, 2014

[12] Deposition of Carroll at 58; Deposition of Ben D. Mahaffey ("Deposition of Mahaffey") at 23–24, attached as exhibit 6 to Memorandum in Opposition to Defendants' Motion for Summary Judgment, docket no. 23-6, filed March 6, 2014.

[13] Deposition of Carroll at 9-10, 60; Deposition of Mahaffey, at 26.

[14] 911 Dispatch Tape, attached  to Errata to Defendants' Motion for Summary Judgment and Supporting Memorandum, Docket No. 26, filed April 3, 2014, as Exhibit 8 to Defendants Motion for Summary Judgment.

[15] 911 Dispatch Tape, DEF00015; Deposition of Mahaffey at 37.

[16] Deposition of Mahaffey at 41-42.

[17] Deposition of Carroll at 32,

[18] Deposition of Eskelson at 11-13; Deposition of Shawn Smith ("Deposition of Smith") at 7-8, attached as exhibit 3 to Memorandum in Opposition to Defendants' Motion for Summary Judgment, docket no. 23-3, filed March 6, 2014; Deposition of Mahaffey at 38; Deposition of Carroll at 34.

[19] Deposition of Carroll at 34.

go back in the room with Barbara, but he stood there looking through the door. And the next thing I know, the police pulled open the door."[20]

Mr. Vest stated in his deposition that the officers rang the doorbell and that Mr. Mahaffey came to the door, which was already open enough for Mr. Mahaffey to see the officers standing on his doorstep.

> Q: And do you recall [the officers] ringing the doorbell?
> A: Yeah, they rang the doorbell because Ben walked out from Barbara.
> Q: Okay.
> A: I remember them ringing the doorbell because Ben walked out. I remember seeing him just pause. From the hallway to the front door, it's probably front [sic] feet and I just saw him pause at the door and look to see the officers were there and that it wasn't the mortician.[21]    . . . .Q: Okay. And you remember Ben answering the door? Is that what I understand?
> A: No, he never answered the door, but he acknowledged them through the door.
> Q: Through the storm door?
> A: Through the storm door.
> Q: The wood door?
> A: The hard door was partially closed and the storm door was completely closed.[22]

13.    Mr. Vest testified that the officers, upon seeing Mr. Mahaffey, opened the glass storm door and then entered the home through the already partially open wooden door.[23]

14.    The officers walked into the house. "They were polite"[24] and told Mr. Mahaffey "they were sorry that they had to be there."[25]  They asked Mr. Mahaffey what Ms. Mahaffey's name and age were and the cause of her death.[26]

---

[20] Deposition of George W. Vest ("Deposition of Vest") at 25, attached as exhibit 8 to Memorandum in Opposition to Defendants' Motion for Summary Judgment, docket no. 23-8, filed March 6, 2014.

[21] Deposition of Vest at 28.

[22] *Id.* at 29-30.

[23] *Id.* at 29-33.

[24] Deposition of Mahaffey at 44.

[25] Deposition of Carroll at 34; Deposition of Mahaffey at 44.

[26] Deposition of Mahaffey at 46-47.

15.     Mr. Mahaffey was told the officers needed to dispose of Ms. Mahaffey's prescription medication.[27]

16.     Ms. Carroll further explained:

Q: Did you say Mr. Mahaffey brought the prescriptions out?
A: He brought the pill bottles to the officers.
Q: And you brought the liquid morphine?
A: Yes.[28]

17.     Ms. Carroll and one of the officers disposed of the liquid morphine in the kitchen sink and noted the disposal..[29]

18.     Mr. Mahaffey brought the pill bottles to the officers in the living room.[30]

19.     One of the officers counted and inventoried the pills with Ms. Carroll on an end table in the living room.[31]

20.     During the entire process beginning with the requirement to gather the prescription medications, up through the counting and inventorying of the drugs, Mr. Mahaffey objected.[32]

21.     While the officers inventoried the medications, Mr. Mahaffey indicated that taking his wife's prescription medications was a violation of his civil rights.[33]

22.     After counting the pills, the officers left.

Q: And what happened after Officer Eskelson and Beth finished counting the medications?
A: . . . . [T]hey went their separate ways and left immediately.[34]

---

[27] Deposition of Carroll at 35-36.

[28] Deposition of Carroll at 36.

[29] *Id.* at  37.

[30] Deposition of Mahaffey at 56.

[31] *Id.* at 57; Deposition of Carroll at 40.

[32] Deposition of Eskelson at 37-40; Good Shepherd Narrative Note, attached as exhibit 9 to Memorandum in Opposition to Defendants' Motion for Summary Judgment, docket no. 23-9, filed March 6, 2014.

[33] Deposition of Carroll at 46.

23.     Mr. Mahaffey never asked the officers to leave.[35]  Mr. Vest testified, however, that Mr. Mahaffey did not like the officers being there:  I remember that he did not like them being there and he was very uncomfortable with it and it was against his constitutional right and it was in very bad taste that they were there. Several times he said that."[36]

24.     He never saw the officers open any drawers, doors or look inside anything that was not in plain view.[37]

25.     The officers never went into the room where Ms. Mahaffey's body was.[38]

26.     The only items the officers took from the Mahaffey home were medications prescribed to Ms. Mahaffey.[39]

27.     Not all of the medications seized would be categorized as "controlled substances" under the Utah Controlled Substances Act.[40]

> Q: Okay. Do you know what the officers actually took from the house?
> A: My recollection is they split them up some way, and I'm not sure who took what, but they all disappeared with the hospice nurse and the officers.
> Q: Barbara's prescriptions?
> A: Yes.
> Q: Did anything else disappear?
> A: No. Well, the morphine pump disappeared.
> Q: Okay. And that was also prescribed to Barbara?
> A: Yes.
> Q: Okay. So nothing other than the medications that were prescribed to Barbara were taken from your home?
> A: Nothing else.[41]

---

[34] Deposition of Mahaffey at 60.

[35] *Id.* at at 45.

[36] Vest Deposition at 43.

[37] Deposition of Mahaffey at 61.

[38] *Id.*

[39] *Id.* at 64.

[40] Deposition of Carroll at 70.

[41] Deposition of Mahaffey at 63-64.

28.     Mr. Mahaffey did not pay for the prescriptions.[42]

29.     Mr. Mahaffey has no evidence that Vernal City police officers treated him

differently from others similar to him.

> Q: Do you have any information that the police have not taken medications from
> people when someone has passed away and they have responded?
> A: Well, some people who have passed away may not be on drugs of the class
> they would seize them.
> Q: Let's take it under hospice care where there's medications. Are you aware of
> any instances where the police have not taken those?
> A: Are you assuming they take them in every one?
> Q: That's what I'm asking you. Do you have any information –
> A: I don't. I don't.[43]

30.     Assistant Chief Keith Campbell was not at the Mahaffey house the night of Ms.

Mahaffey's passing.[44]

31.     Ken Bassett was not present at the Mahaffey home the night of Ms. Mahaffey's

passing.[45]

32.     Ken Bassett has no authority to approve or adopt Vernal City police policies.[46]

33.     Assistant Chief Campbell has no authority to approve or adopt Vernal City police

policies.[47]

34.     There is no written Vernal City policy requiring the collection of prescription

medications when a person passes away.[48]

---

[42] *Id.* at 115.

[43] *Id.* at 110-11.

[44] *See* Deposition of Campbell at 14.

[45] *See* Deposition of Bassett at 14.

[46] *Id.* at 43.

[47] *See Id.* at 10-12.

[48] Declaration of Assistant Chief Keith Campbell ¶ 5, attached as exhibit 7 to Defendants' Motion for Summary Judgment, docket no. 20-7, filed January 28, 2014.

35.     No policy was ever adopted by the Vernal City Council giving the police department authority to enter homes following an attended death for the purpose of seizing prescription drugs.

36.     The collection of Ms. Mahaffey's medications was the first time Mr. Bassett learned the police department collected medications under such circumstances.[49]  There is no evidence he played a role in creating such a practice.

37.     There is no evidence that Chief Campbell played a role in creating such a practice.

> Q: Do you have any information about Ken [sic] Campbell's participation in the practice of collecting medications from those who have passed?
> A: If he's the supervising officer and they do it and are ordered to houses, then he is responsible by nature of his position.
> Q: Well, that's your assumption. I'm asking you if you have any facts that support that?
> A: They deny that it happens. They deny any policy.
> Q: Do you have any facts that support your assertion?
> A: No.[50]

---

[49] Deposition of Bassett at 27.

[50] Deposition of Mahaffey at 112.

**DISCUSSION**

**1. SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[51]  In applying this standard, a court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[52]   However, "the nonmoving party must present more than a scintilla of evidence in favor of his position."[53] A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[54]

**2. FOURTH AMENDMENT CLAIM**

Mahaffey alleges a violation of his Fourth Amendment rights[55] occurred when police officers entered his home without a warrant on the night of his wife's death to collect, count and remove all of her prescription medications.

"The right of the people to be secure in their . . . houses  . . . against unreasonable searches and seizures, shall not be violated."[56] "'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable

---

[51] Fed. R. Civ. P. 56(a).

[52] *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d 1199, 1204 (10th Cir. 2011) (quoting *Lewis v. Circuit City Stores, Inc.*, 500 F.3d 1140, 1146 (10th Cir. 2007)).

[53] *Ford v. Pryor*, 552 F.3d 1174, 1178 (10th Cir. 2008).

[54] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

[55] Amended Complaint (Count I) at 6-7.

[56] U.S. Const. amend. IV.

governmental intrusion.'"[57]   Additionally, "[i]t is a 'basic principle of Fourth Amendment law'

that searches and seizures inside a home without a warrant are presumptively unreasonable.'"[58]

However, "[i]t is . . . well settled that one of the specifically established exceptions to the

requirements of both a warrant and probable cause is a search that is conducted pursuant to

consent.[59] Consent is determined from the totality of the circumstances, and must be given

voluntarily.[60] The voluntariness of any consent given is demonstrated through "clear and positive

testimony that consent was 'unequivocal and specific' and 'freely and intelligently' given. . . .

without duress or coercion, express or implied."[61] In addition, the police must remain within the

scope of the consent which was given; exceeding that scope is also a violation of the Fourth

Amendment.[62]

The Defendants argue that non-verbal conduct, with other factors, can constitute

voluntary consent, and that the police are only required to reasonably believe that they have

consent to their actions. They assert that Mr. Mahaffey's consent to the police entering his home

was implied when he called police dispatch, held the door open for the officers, didn't object

when they walked in, and never asked them to leave. It was thus reasonable for the officers to

believe that his consent was given. [63]

Mr. Mahaffey responds that the Defendants have not proven voluntary and knowing

consent, because simply calling the police does not constitute consent to their entering a home.

Mr. Mahaffey states he did not know that the purpose of the police visit was to come and take his

---

[57] *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

[58] *Payton v. New York*, 445 U.S. 573, 586 (1980).

[59] *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

[60] *United States v. Dewitt*, 946 F.2d 1497, 1500 (10th Cir. 1991).

[61] *Id.* (citations omitted).

[62] *Id.*

[63] Motion at 17-18.

wife's prescription medications; he thought that police notification was hospice protocol.[64]  He also argues that he lacked the mental capacity to consent, due to his advanced age and the very recent death of his wife, with its consequent emotional effects.[65]

Mr. Mahaffey additionally asserts that the scope of any possible limited consent was exceeded, because allowing the police entry into a home does not constitute consent to a search of the home.[66] He avers that his verbal objections during the collection and inventory of the medications clearly defined the scope of whatever consent there may have been and that it did not extend to a search and seizure.[67] Defendants assert that the officers' actions did not constitute a search, because they did not open any drawers or doors, and the items taken from the home were brought to them.[68]

The record presents conflicting evidence as to whether Mr. Mahaffey actually consented to the officers' entry to his home. Beth Carroll is the hospice worker who responded to Mr. Mahaffey's report of his wife's death, and was present when the police arrived.[69] She stated that she remembered Mr. Mahaffey "opening the door for them and inviting them in."[70] Officer Smith, one of the responding officers, stated that they had not needed to knock or ring the doorbell because Mr. Mahaffey was already at the door and opened it.[71] Officer Eskelson did not

---

[64] Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Opposition") at 15-16, docket no. 23, filed March 6, 2014.

[65] *Id.* at 18-19.

[66] *Id.* at 16.

[67] *Id.* at 17.

[68] Motion at 18-19.

[69] Deposition of Carroll at 31:1-6; 35:7-16; Deposition of Smith at 7-8; Deposition of Eskelson at 10.

[70] Deposition of Carroll at 34:14-17.

[71] Deposition of Smith at 6-7, 8:18-19.

recall knocking or ringing the doorbell, but stated that Mr. Mahaffey answered the door, and that it was pulled open for them. He said "I wouldn't open the door myself."[72]

However, family friend George Vest says the opposite:

> I just know I was really surprised that the police walked into the house. . . . I just remember the look of disgust on Ben's face that the police were knocking on his door and I thought he was going to turn around and go back in the room with Barbara, but he stood there looking through the door. And the next thing I know, the police pulled open the door and finished opening the really heavy wood door on the inside . . . and walking in and I thought "That's really weird."[73]

In his deposition, Mr. Mahaffey stated "I think I was in the bedroom when the doorbell rang."[74] He also recalled a conversation with Mr. Vest, in which they discussed how the police entered the house. "We talked about how the police came into the house. . . . we talked about how the door was open, the police just came in. . . . It was kind of like letting the dog in the door."[75] This conflicting testimony presents a genuine issue of material fact which may not appropriately be resolved through summary judgment.

The scope of any consent which may have been given is also in dispute. Mr. Mahaffey could not recall what he said at the time that the officers inventoried and removed the prescription medications.[76] Defendant Officers Smith and Eskelson, as well as George Vest, and Beth Carroll stated that Mr. Mahaffey complained that the taking of the medications was a violation of his civil rights.[77] There is also evidence that Mr. Mahaffey's behavior was cordial.[78]

---

[72] Deposition of Eskelson at 11:3- 12: 6, 13: 2-3.

[73] Deposition of Vest at 25.

[74] Deposition of Mahaffey at 38.

[75] *Id.* at 8.

[76] Deposition of Mahaffey at 62.

[77] Deposition of Smith at 15:1-4; Deposition of Eskelson at 37-40; Deposition of Vest at 44, 46-48; Deposition of Carroll at 46, 47, 86-87; Good Shepherd Homecare & Hospice Narrative Note at 1-2, docket no. 23-9, filed March 6, 2014.

[78] Hospice Narrative Note at 2.

Additionally, Beth Carroll testified that Mr. Mahaffey had been informed and should have been aware that the police would confiscate his wife's prescription medications when they arrived. It is reasonably possible that a jury would find that in spite of his protestations at the time of the seizure, Mr. Mahaffey had originally consented to it and did not subsequently revoke that consent. In that case, the officers remained within its scope. The opposite is also possible, in that a jury could find that consent to the seizure of the medications was not given, in which case the officers' conduct did exceed the scope of any consent. Therefore, disputes of material fact surrounding Mr. Mahaffey's Fourth Amendment claim preclude summary judgment.

### 3. QUALIFIED IMMUNITY

Defendants argue qualified immunity requires dismissal of Mr. Mahaffey's claims.[79] Qualified immunity is intended to balance two competing concerns: the provision of an avenue for citizens to obtain redress when a public official abuses his power versus the substantial social costs incurred when government officials are exposed to damages suits.[80] The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[81] Thus, qualified immunity defenses are evaluated with a two prong test: (1) whether the facts show that a plaintiff's constitutional rights were violated, and (2) whether the law was clearly established at the time of the alleged violation.[82] The order in which the prongs are addressed is not relevant, and is within the discretion of the trial judge.[83]

---

[79] Motion at 14.

[80] *Lawrence v Reed*, 406 F.3d 1224, 1230-31 (10th Circuit 2005).

[81] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[82] *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

[83] *Id.* at 236-44.

When determining whether a right is clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[84] In addition, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."[85] However, "the focus of the qualified immunity inquiry is on what a reasonable officer should have known."[86] It is reasonable to expect that a competent public official should know the law that applies to his conduct.[87] This pertains equally to the police, who "generally have a duty to know the basic elements of the laws they enforce."[88]

Defendants argue that the law is not clearly established because they found no case determining property interests in prescription medications, some of which are controlled substances, after the death of the person for whom they were prescribed. However, there are many Supreme Court and Tenth Circuit cases defining the parameters of the Fourth Amendment. The law is clearly established that police may not enter a house and seize anything without a search warrant, absent some exception to the warrant requirement. "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no."[89] However, if Mr. Mahaffey consented to the officers' entry and seizure of the medications, there would have been no constitutional violation. As discussed, disputes of material fact on the consent issue preclude a grant of summary judgment based on qualified immunity.

---

[84] *Anderson v Creighton*, 483 U.S. 635, 640 (1987).

[85] *Cortez v. McCauley*, 478 F.3d 1108, 1114–15 (10th Cir.2007).

[86] *Lawrence*, 406 F.3d at 1232.

[87] *Lawrence*, 406 F.3d at 1231 (citing *Harlow*, 457 U.S. at 819).

[88] *Kelly v. Borough of Carlisle*, 622 F.3d 248, 258 (3d Cir. 2010).

[89] *Kyllo*, 533 U.S. at 31.

## 4. EQUAL PROTECTION CLAIM

Mr. Mahaffey has not shown a genuine dispute of material fact on his equal protection claim[90] because he has submitted no evidence showing that he was treated differently from others similarly situated. Mr. Mahaffey alleges that his constitutional right to equal protection was violated when officers entered his home without a warrant to inventory and confiscate all of his deceased wife's prescription medications. To succeed on this claim, Mr. Mahaffey must show that he was "intentionally treated differently from others similarly situated," and that there was no "rational basis" for it.[91]

On summary judgment, factual assertions must be supported by citing to particular parts of materials in the record.[92] Defendants cite Mr. Mahaffey's deposition to show he admitted he had no evidence at that time to show that he was treated differently from others similarly situated.[93] Subsequent to his deposition, Mr. Mahaffey has not provided any evidence of differential treatment. He also did not respond to the issue in his opposition to the defendants' motion. Because Mr. Mahaffey has failed to show a genuine issue of material fact, Defendants are entitled to summary judgment on the equal protection claim.

## 5. DUE PROCESS CLAIM

Mr. Mahaffey asserts that he was deprived of his private property in violation of the Fifth and Fourteenth Amendments.[94] The Fifth and Fourteenth Amendments each contain Due Process clauses which require the government at federal and state levels to satisfy certain requirements

---

[90] Amended Complaint (Count II) at 8-9.

[91] *SECSYS, LLC v. Vigil*, 666 F.3d 678, 688 (10th Cir. 2012).

[92] Fed. R. Civ. P. 56(c)(1)(A).

[93] Deposition of Mahaffey at 108-12.

[94] Amended Complaint at 10, docket no. 4, filed February 7, 2013.

before a deprivation of a property right.[95] However, "[t]he Due Process Clause of the Fifth Amendment applies only to action by the federal government while the Due Process Clause of the Fourteen[th] Amendment applies to actions by state governments."[96]  All of the defendants in this case are local government officials. There is no federal involvement whatsoever; therefore there is no claim under the Fifth Amendment.[97] Nevertheless, "the Due Process Clause of the Fourteenth Amendment imposes no more stringent requirements upon state officials than does the Due Process Clause of the Fifth Amendment upon their federal counterparts."[98] Thus, due process rights are as equally guaranteed under the Fourteenth Amendment as under the Fifth Amendment.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment."[99] In contrast to some other legal rules, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances."[100] "(D)ue process is flexible and calls for such procedural protections as the particular situation demands."[101] However, there are two essential elements: (1) the right to notice and (2) and a meaningful opportunity to be heard.[102]  "The notice must be of such nature as reasonably to

---

[95] U.S. Const. amend. V; U.S. Const. amend. XIV, § 1.

[96] *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 748 n.2 (10th Cir. 2013).

[97] *Id.*

[98] *Ward v. Anderson*, 494 F.3d 929, 932 n.3 (10th Cir. 2007).

[99] *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

[100] *Id.* 334 (quoting *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961)).

[101] *Id.* (alteration in original) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

[102] *Elliott v. Martinez*, 675 F.3d 1241, 1245 (10th Cir. 2012).

convey the required information,"[103] and the hearing must be "granted at a meaningful time and in a meaningful manner."[104]

In analyzing a procedural due process claim, the court must first determine whether the interest at issue is within the Fourteenth Amendment's protection of liberty and property.[105] Mr. Mahaffey claims that he had a protectable property interest in his wife's medications. A property interest is established by showing that the party had a legitimate claim of entitlement arising from some independent source such as state law.[106]

In support of their motion, Defendants argue that Plaintiff's due process rights were not violated because under the Utah Controlled Substances Act, Mr. Mahaffey could have no property interest in his wife's medications because his possession of them after her death was illegal. Defendants also argue that Mr. Mahaffey has not shown that postdeprivation remedies were inadequate.

**Property Interest**

With regard to the existence of a property interest, the evidence shows that some of the drugs confiscated were not controlled substances as defined by the Act.[107] Mr. Mahaffey asserts that at least concerning the non-controlled drugs, his possession was not illegal and Defendants' argument in this regard is therefore overstated. Mr. Mahaffey further asserts that as to those prescriptions that were controlled substances, Defendants have failed to provide legal justification for their theory that he could not have a property interest in those items. Mr. Mahaffey argues that his property interest in the medications was created under state law upon

---

[103] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

[104] *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

[105] *Bd. of Regents v. Roth*, 408 U.S. 564, 571 (1972).

[106] *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

[107] Deposition of Carroll at 70; Care at Time of Death Discharge Summary, Docket no. 23-10, filed March 6, 2014.

Mrs. Mahaffey's passing by virtue of inheritance. He further argues that as the surviving husband, he should have had the right and duty to dispose of the medications and to handle her affairs without usurpation by the government. Mr. Mahaffey concedes that his interest in the medications is likely of little economic value, but that he should have had the right to dispose of them as part of the normal grieving process.[108]

As to the illegality of his possessing controlled substances prescribed for his wife after her death, the Utah Supreme Court has concluded that the term "possess" as used in the statute criminalizing possession without prescription "excludes transitory possession of a controlled substance" and "implicitly includes the defense of innocent possession."[109] The Utah Supreme Court approved a jury instruction stating that "if (1) the controlled substance was obtained innocently and held with no illicit or illegal purpose, and (2) the possession of the controlled substance was transitory; that is, the defendant took adequate measures to rid himself of possession of the controlled substance as promptly as reasonably possible," then the statute was not violated.[110] The court noted that a standard of reasonableness should be applied to the innocent possession of a controlled substance.[111] Thus, an individual is not required to focus his efforts exclusively on ridding himself of the controlled substance. Further, the defense does not impose an arbitrary time limit "or require only fleeting or momentary possession that may not be practical given the circumstance. . . . If a possessor of a controlled substance takes reasonable action [to dispose of the controlled substance], possession may be longer than momentary."[112] In construing the statute, the court gave examples of injustices that could result from strictly

---

[108] Opposition at 21-22.

[109] *State v. Miller*, 193 P.3d 92, 96 (Utah 2008).

[110] *Id.* at 97.

[111] *Id.*

[112] *Id.*

construing the term "possess" to include "every type of possession, whether culpable or innocent."[113] One of the examples given by the court seems particularly relevant here:  a daughter who picks up her sick mother's prescription and takes it to her mother's home.[114]

Mr. Mahaffey came into possession of the drugs upon his wife's passing. There is no evidence that he had any illicit or illegal purpose in possessing his deceased wife's controlled substances. Further, it is reasonable to assume that he would have disposed of them in a timely manner. Thus, Mr. Mahaffey has established a property interest in the controlled drugs, even though it may have been only a temporary interest.

**Postdeprivation Remedies**

Finally, Defendants argue that there was no due process violation because Mr. Mahaffey has not shown that postdeprivation remedies were inadequate. While it is true that under some circumstances, postdeprivation remedies may satisfy procedural due process rights, that is not the case "where a deprivation of property is caused by conduct pursuant to established state procedure".[115] In that situation, a state postdeprivation remedy does not satisfy due process.[116] Here, while there is no written policy, there is clearly an established procedure implemented by government officials. Former Good Shepherd administrator Sandi Rust testified that the hospice was contacted by the police in 2007 or 2008, and directed to call the police department at the time of a patient's death, so officers could inventory and remove the deceased patients' prescription medications.[117] Hospice nurse Beth Carroll said "I was always told it was policy."[118]

---

[113] *Id.* at 96.

[114] *Id.*

[115] *Hudson v.* Palmer, 468 U.S. 517, 532 (1984); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982).

[116] *Hudson*, 468 U.S. at 532, 534; *Logan*, 455 U.S. 422.

[117] Deposition of Sandi Rust ("Deposition of Rust") at 10:23-11:2, attached as exhibit 7 to Memorandum in Opposition to Defendants' Motion for Summary Judgment, docket no. 23-7, filed March 6, 2014.

[118] Deposition of Carroll at 26:23.

Defendant Eskelson stated "[w]e've done it since I've been here."[119] Plaintiff Mahaffey averred Defendant Campbell told him "[i]t's a good practice and we're going to continue it."[120] Defendant Campbell affirmed "[i]f I didn't agree with the program, I wouldn't be doing it."[121] Thus, because the Plaintiff's deprivation of his property was caused by conduct pursuant to an established state procedure, postdeprivation remedies do not satisfy procedural due process, and their adequacy is irrelevant.

There are disputed issues of material fact concerning whether Mr. Mahaffey consented to the seizure of the drugs. Therefore, summary judgment on this claim is not appropriate.

### 6. SUPERVISORY LIABILITY

[W]hen a plaintiff sues an official under . . . § 1983 for conduct "arising from his or her superintendent responsibilities," the plaintiff must plausibly plead and eventually prove not only that the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well."[122]

The statute also

allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution."[123]

A plaintiff may therefore succeed on a section 1983 claim against a supervisor by showing that "(1) the defendant promulgated, created, implemented or possessed responsibility

---

[119] Deposition of Eskelson at 56:19-20.

[120] Deposition of Mahaffey at 82:7-10.

[121] Deposition of Campbell at 26:4-11.

[122] *Dodds v. Richardson*, 614 F.3d 1185, 1198 (10th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, (2009).

[123] *Dodds*, 614 F.3d at 1199 (quoting 42 U.S.C. § 1983).

for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation."[124]

Defendants assert that a court must find personal participation in the constitutional violation before supervisory liability can be found. They argue that, because Defendants Bassett and Campbell were not physically present during the alleged constitutional violations, they did not participate personally and are entitled to summary judgment.[125]

However, personal participation does not require "the sort of on-the-ground, moment-to-moment control that defendants appear to suggest."[126]  As discussed, if a defendant "promulgated, created, implemented or possessed responsibility for the continued operation of a policy"[127] through which a constitutional violation occurred, the first prong of the test is satisfied.

**Assistant Chief of Police Campbell**

As the assistant chief of police, Defendant Campbell is jointly responsible for the day-to-day operations of the police department.[128] He is also jointly responsible, with the chief of police, for some policy decisions.[129] Therefore, it is not unreasonable to infer that he was also responsible for the continuation of the department's policy of entering homes and confiscating prescription drugs after a death occurs. The facts, taken in a light most favorable to Mr. Mahaffey,[130] show that Defendant Campbell "played more than a passive role in the alleged

---

[124] *Dodds*, 614 F.3d at 1199.

[125] Motion at 28.

[126] *Dodds*, 614 F.3d at 1299 (quoting *Davis v. City of Aurora*, 705 F. Supp. 2d 1243, 1263-64 (D. Colo. 2010)).

[127] *Dodds*, 614 F.3d at 1199.

[128] Deposition of Campbell at 6-12.

[129] *Id.* at 11.

[130] *Darr v. Town of Telluride, Colo.*, 495 F.3d 1243, 1251 (10th Cir. 2007).

constitutional violation—he . . . have deliberately enforced or actively maintained the polic[y] in question."[131] If proven at trial, the personal participation prong of the test would be satisfied.

Mr. Mahaffey argues that his Fourth and Fourteenth Amendment rights were violated as a result of that policy. By allowing the policy to continue, Campbell would have caused the constitutional harm of which Mr. Mahaffey complains. Thus, the second prong, showing causation, is fulfilled.

Finally, to satisfy the third element of supervisory liability, the parties agree that the requisite state of mind is deliberate indifference.[132] Mr. Mahaffey met with Defendant Campbell after the alleged violations to discuss his concerns about the actions of the police on the night of his wife's death. Mr. Mahaffey testified that at the end of the conversation, Campbell stated that '[i]t's a good practice and we're going to continue it."[133] If true, this establishes the requisite state of mind necessary for a jury to find supervisory liability, satisfying the third prong of the test. Under these facts, qualified immunity is inappropriate and summary judgment is denied with regard to this Defendant.

**City Manager Bassett**

Defendant Bassett has been city manager for thirty-two years; as such he is responsible for the day-to-day operations of the City of Vernal.[134] This includes the operation of the police department on a general policy level.[135] He testified in his deposition that the abuse of prescription drugs is a concern in his community which has been discussed in city council and

---

[131] *Dodds*, 614 F.3d at 1204.

[132] Motion at 26; Opposition at 27; Reply at 33; *see Dodds*, 614 F.3d at 1204-05.

[133] Deposition of Mahaffey at 75:10-11.

[134] Deposition of Bassett at 4:7-16, 24-25;8, attached as Exhibit 1 to Memorandum in Opposition to Defendants' Motion for Summary Judgment, docket no. 23-1, filed March 6, 2014.

[135] *Id.* at 5:10-24.

public safety committee meetings.[136] However, he also testified that no formal policy had been agreed upon, and he did not know that the police were taking these steps as a means to address the concern until it was brought to his attention by Mr. Mahaffey's complaints.[137] Mr. Mahaffey has not disputed Bassett's assertion that he was unaware of the policy at the time of the alleged constitutional violations. Under these circumstances, Mr. Mahaffey has failed to establish the first element of supervisory liability:  that Bassett was responsible for the promulgation, creation, implementation, or continued operation of the subject policy. Defendants' motion for summary judgment is therefore granted with regard to Defendant Bassett.

### 7. MUNICIPAL LIABILITY

When a plaintiff seeks a determination of municipal liability for a violation of a federally protected right, he must establish three elements: (1) that there is a policy or custom in the community, (2) that the policy or custom was the cause of his injury, and (3) that "the municipal action was taken with the requisite degree of culpability."[138] It is not necessary that a policy be explicit; it is sufficient if there is a "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'"[139] The causal connection is sufficient when a plaintiff shows that a municipality's deliberate action was the "moving force" behind the violation of the plaintiff's protected right.[140] The Supreme Court has stated that "proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right

---

[136] *Id.* at 6-7.

[137]  *Id.* at 25, 27.

[138] *Dodds*, 614 F.3d at 1202 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)); *Schneider*, 717 F.3d at 769.

[139] *Milligan-Hitt v. Bd. of Trustees*, 523 F.3d 1219, 1225 (10th Cir. 2008) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)); *Brown*, 520 U.S. at 404.

[140] *Brown*, 520 U.S. at 404.

necessarily establishes that the municipality acted culpably."[141] Additionally, "the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains."[142]

Here, Defendants argue that there can be no municipal liability because there was no constitutional violation. This argument is unavailing, however, because disputed facts exist concerning whether Mr. Mahaffey consented to the officers' entry into the home and confiscation of the drugs.

As to whether there was a custom sufficient to satisfy the requirements to find municipal liability, it is not disputed that there was a practice in place. Sandi Rust testified that police officers contacted Good Shepherd hospice about it in late 2007 or early 2008.[143] Defendant Campbell stated, according to Mr. Mahaffey, that "[i]t's a good practice and we're going to continue it."[144] The fact that this policy had not been officially enacted by the Vernal City Council will not immunize the city from liability. The policy apparently was implemented by the Chief of Police and Defendant Assistant Chief Campbell and carried out at their direction by their subordinates.  This custom or policy was sufficiently permanent and well settled as to have the force of law. Further, Mr. Mahaffey's alleged constitutional injuries were caused by the Vernal police's enforcement of the policy by routinely entering the homes of persons who had died outside a hospital or care center and confiscating their prescription medications without a warrant.  Finally, as previously discussed, the actions were taken with "the requisite degree of

---

[141] *Id.* at 405

[142] *Id.*

[143] Deposition of Rust at 10-11.

[144] Deposition of Mahaffey at 75.

culpability" as evidenced by the statements of Defendant Campbell.  Accordingly, Vernal City's motion for summary judgment is denied.

## ORDER

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part. Summary judgment is granted in favor of Defendants on Mr. Mahaffey's equal protection claim.  Summary judgment is also granted in favor of Defendant Bassett on all claims.  Summary judgment is denied as to the remaining claims due to genuine issues of material fact. Defendants are also not entitled to summary judgment on the basis of qualified immunity.

Dated December 29, 2014.

BY THE COURT:

_____
David Nuffer
United States District Judge